UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL PETERSEN,<br><br>        Plaintiff,<br><br>    v.<br><br>GOLD BOND BUILDING PRODUCTS, LLC,<br><br>        Defendant. | Case No. 24-cv-00617-TSH<br><br>**ORDER RE: MOTION TO REMAND**<br><br>Re: Dkt. No. 14 |

## I.    INTRODUCTION

Pending before the Court is Plaintiff Michael Petersen's Motion for Order Remanding Action to State Court. ECF No. 14. Defendant Gold Bond Building Products filed an Opposition (ECF No. 15) and Plaintiff filed a Reply (ECF No. 18). For the reasons stated below, the Court **GRANTS** the motion.[1]

## II.    BACKGROUND

Plaintiff Michael Petersen filed this putative class action on December 19, 2023 in Contra Costa County Superior Court against Defendant Gold Bond Building Products, LLC ("Gold Bond"). In the complaint, Plaintiff alleges failure to pay overtime wages, meal period violations, rest period violations, failure to pay all sick time, wage statement violations, waiting time penalties, failure to reimburse necessary business expenses, and unfair competition in violation of California Business and Professions Code § 17200 et seq. Compl. at 1, ECF No. 1-1. The complaint does not disclose the dollar amount in controversy. *See generally id.*

On February 1, 2024, Defendant filed a notice of removal to federal court pursuant to the

---

[1] The parties consent to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c). ECF Nos. 12, 13.

1   Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), contending that the total amount in

2   controversy for all class members exceeds the $5 million threshold for jurisdiction under CAFA.

3   Notice of Removal at 1, 8–10, ECF No. 1.  Plaintiff moves to remand, arguing that Defendant has

4   failed to demonstrate, by a preponderance of the evidence, that the amount in controversy has been

5   met.  Plaintiff's Motion at 3, ECF No. 14.  Because Defendant has failed to present reasonable

6   estimates sufficiently grounded in evidence that exceed the $5 million threshold required for

7   federal jurisdiction under CAFA, the Court grants Plaintiff's motion.

### III.   LEGAL STANDARD

9   CAFA gives federal courts jurisdiction over class actions in which there are at least 100

10  members of the proposed plaintiff class, minimal diversity of citizenship exists between any

11  member of a plaintiff class and any defendant, and the total amount in controversy exceeds

12  $5,000,000, exclusive of interests and costs.  28 U.S.C. § 1332(d)(2), (5)(B); *Dart Cherokee Basin*

13  *Operating Co., LLC v. Owens*, 574 U.S. 81, 84-85 (2014).  The defendant or defendants to a class

14  action that satisfies CAFA's requirements may remove the action to federal court. 28 U.S.C. §

15  1441(a).  There is no presumption against removal based on CAFA, "which Congress enacted to

16  facilitate adjudication of certain class actions in federal court."  *Dart Cherokee*, 574 U.S. at 89.

17  Under CAFA, a defendant removing a case must provide "a short and plain statement of

18  the grounds for removal[.]"  *Ibarra v. Manheim Invs., Inc.*, 775 F.3d 1193, 1197 (9th Cir. 2015).

19  The notice of removal need only include "a plausible allegation that the amount in controversy

20  exceeds the jurisdictional threshold" and does not need to be supported by evidentiary

21  submissions.  *Id.* (quoting *Dart Cherokee*, 574 U.S. at 84).  Courts accept the defendant's amount-

22  in-controversy allegation unless it is contested by the plaintiff or questioned by the court.  *Dart*

23  *Cherokee*, 574 U.S. at 87.  "If the plaintiff contests the defendant's allegation, § 1446(c)(2)(B)

24  instructs: '[R]emoval . . . is proper on the basis of an amount in controversy asserted' by the

25  defendant 'if the district court finds, by the preponderance of the evidence, that the amount in

26  controversy exceeds' the jurisdictional threshold."  *Id.* at 88; 28 U.S.C. § 1446(c)(2)(B).

27  When a plaintiff contests "a defendant's assertion of the amount in controversy . . . both

28  sides submit proof and the court decides, by a preponderance of the evidence, whether the amount-

1  in-controversy requirement has been satisfied." *Ibarra*, 775 F.3d at 1195 (quoting *Dart Cherokee*,
2  574 U.S. at 88).  In the event of a challenge, "the defendant seeking removal bears the burden to
3  show by a preponderance of the evidence that the aggregate amount in controversy exceeds $5
4  million[.]" *Id.* at 1197.  "The parties may submit evidence beyond the complaint such as
5  affidavits, declarations, or other 'summary-judgment type evidence relevant to the amount in
6  controversy[.]'" *De Vega v. Baxter Healthcare Corp.*, 507 F. Supp. 3d 1214, 1217 (N.D. Cal.
7  2019 (quoting *Singer v. State Farm Mut. Auto. Ins. Co.*, 116 F.3d 373, 377 (9th Cir. 1997)).
8  "[A] defendant cannot establish removal jurisdiction by mere speculation and conjecture, with
9  unreasonable assumptions." *Ibarra*, 775 F.3d at 1197.  "CAFA's requirements are to be tested by
10 consideration of real evidence and the reality of what is at stake in the litigation, using reasonable
11 assumptions underlying the defendant's theory of damages exposure." *Id.* at 1198.  "The burden
12 to establish the amount in controversy by a preponderance of the evidence, however, does not
13 require the defendant to 'research, state, and prove the plaintiff's claims for damages.'" *De Vega*,
14 507 F. Supp. 3d at 1217 (quoting *Donald v. Xanitos, Inc.*, No. 14-cv-05416-WHO, 2015 WL
15 1774870, at *4 (N.D. Cal. 2015)).

## IV.   DISCUSSION

In support of its notice of removal, Defendant submitted the declaration of Elizabeth Bergstrom, HRIS & Compensation Manager for NG Corporate, LLC, which provides human resources services to Defendant.  ECF No. 3 ("First Bergstrom Decl.")  Defendant alleged in its notice of removal that the amount in controversy is not less than $6,272,355.  Notice of Removal ¶ 74.  In opposition to Plaintiff's motion to remand, Bergstrom provided a second declaration with certain additional details, and Defendant provided an amended calculation of the amount in controversy of not less than $6,209,467.  ECF No. 16 ("Second Bergstrom Decl."); Opp'n at 2, ECF No. 15.

Bergstrom declares that, from January 1, 2021 to mid-January 2024, Defendant employed approximately 197 non-exempt employees in California.  Second Bergstrom Decl. ¶ 5.  Of those employees, approximately 196 worked on a full-time basis during that period, working approximately 14,588 workweeks during that period.  *Id.* ¶ 7.  Of the 197 non-exempt employees,

3

1  "approximately 192 employees worked overtime between January 1, 2021 and mid-January
2  2024." *Id.* ¶ 6. Those employees worked approximately 14,523 workweeks during that period
3  and worked approximately 12.03 overtime hours per week on average. *Id.* Bergstrom declares
4  that Defendant paid the 197 non-exempt employees an average hourly rate of approximately
5  $32.97, and an average hourly overtime rate of $49.45. First Bergstrom Decl. ¶¶ 10–11.
6  Bergstrom declares that Defendant employed approximately 160 proposed putative class members
7  between December 19, 2022 and mid-January 2024. First Bergstrom Decl. ¶ 9. Bergstrom further
8  declares that at least 94 non-exempt employees separated from their employment with Defendant
9  between January 1, 2021 and mid-January 2024, all of whom worked on a full-time basis for
10  Defendant during that period. Second Bergstrom Decl. ¶ 10. Bergstrom attests that 93 of the 94
11  employees who previously worked for Defendant and whose employment was terminated between
12  January 1, 2021 and mid-January 2024 had been separated for at least 30 days as of February 1,
13  2024. *Id.* ¶ 11.

14  Based on the number of employees in the putative class and subclasses, the average hourly
15  wage, and the number of workweeks at issue, Defendant calculates a total amount in controversy
16  of $6,209,467, consisting of approximately $718,162 in allegedly unpaid overtime, purportedly
17  missed rest period penalties of approximately $1,442,899, purportedly missed meal period
18  penalties of approximately $1,442,899, claimed wage statement penalties of approximately
19  $640,000 (*see* Notice of Removal ¶ 63), claimed waiting time penalties of approximately
20  $723,614, and attorneys' fees of $1,241,893. Opp'n at 9, 12, 14, 16, 18.

21  The parties' dispute turns primarily on whether Defendant is entitled to assume that
22  putative class members worked one hour of unpaid overtime every workweek, that they missed
23  three rest periods and three meal periods every workweek, that applicable subclass members may
24  be entitled to the maximum penalties on the wage statement and waiting time claims, and that
25  attorneys' fees would be recoverable for all of Plaintiff's claims.

26  **A.   Declarations Can Lay a Sufficient Foundation for the Facts Defendant Asserts**
27  Plaintiff contends the first Bergstrom declaration is "conclusory and unsupported" and
28  criticizes the declaration for failing to include copies of relevant records and evidence of unpaid

4

1  wages. Mot. at 6. Plaintiff further argues the second Bergstrom declaration "fails to account for
2  each individual class members' days off, holidays, sick days, absences and the like," or for when
3  each separated employee left Gold Bond. Reply at 5–6. However, as support for its original
4  Notice of Removal, Defendant needed only to present "plausible allegation[s]" and did not have to
5  present an admissible evidentiary submission. *Ibarra*, 775 F.3d at 1197. To the extent
6  Bergstrom's declarations are offered as evidence in opposition to remand, "submission of copies
7  of underlying documents is not critical." *De Vega*, 507 F. Supp. 3d at 1217 n.1.

**B.     Overtime Wages**

Under California law, an employee who receives "less than the . . . legal overtime compensation applicable to the employee is entitled to recover in a civil action the unpaid balance of the full amount of . . . overtime compensation," including interest, attorneys' fees and costs. Cal. Lab. Code § 1194. Plaintiff's first cause of action alleges that putative class members "worked regular shifts that lasted longer than 8.0 hours in a workday and more than 40 hours in a workweek" and "were not properly paid at the correct overtime rate for all overtime hours worked due to Defendant's uniform failure to include all forms of compensation/remuneration . . . in calculating the 'regular rate of pay' for purposes of overtime compensation." Compl. ¶ 18. These forms of compensation "includ[e], but [are] not limited to, commissions, incentives, discretionary bonuses, and all other forms of remuneration[.]" *Id.* Plaintiff alleges a "policy of requiring . . . non-exempt employees to work" overtime "without compensating them at the lawful rate of one-half [*sic*] (1 1/2) their regular rate of pay." *Id.* ¶ 21. In his eighth cause of action, for unfair competition, Plaintiff alleges that Defendant engaged in unfair or unlawful business practices by, inter alia, "failing to pay for all overtime wages, double time and sick pay wages at the proper rates[.]" *Id.* ¶ 83. Plaintiff's complaint defines the putative "Overtime Subclass" to include "[a]ll current and former non-exempt hourly employees who worked for Defendant in California and who worked overtime hours during at least one shift, during the four years immediately preceding the filing of the Complaint through the date of trial." *Id.* ¶ 37.

To estimate the amount in controversy for Plaintiff's overtime claims, Defendant assumes each of the 192 members of the putative Overtime Subclass worked one hour of unpaid overtime

5

1 per week. Opp'n at 9. Defendant then multiplies one hour per week by the average hourly

2 overtime rate of $49.45, and by 14,523 workweeks worked. *Id.* This amount totals $718,162. *Id.*

3     Plaintiff argues Defendants were unreasonable to assume exactly one full hour of unpaid

4 overtime per employee per workweek because Plaintiff does not actually allege that any overtime

5 hours were entirely unpaid, but rather that the "regular rate of pay" used to calculate overtime pay

6 was not properly calculated. *See* Mot. at 5–6. The Court agrees. Defendant cites *Garza v. WinCo*

7 *Holding, Inc.*, No. 12-cv-1354-JLT-HBK, 2022 WL 902782, at *5 (E.D. Cal. Mar. 28, 2022),

8 *Kincaid v. Educ. Credit Mgmt. Corp.*, No. 21-cv00863-TLN-JDP, 2022 WL 597158, at *4 (E.D.

9 Cal. Feb. 28, 2022), and *Wicker v. ASC Profiles LLC,* No. 19-cv-02443-TLN-KJN, 2021 WL

10 1187271, at *2 (E.D. Cal. Mar. 30, 2021), for the proposition that an assumed violation rate of one

11 hour of overtime per workweek is reasonable. However, none of these cases concern allegations

12 that the base rate of pay from which overtime wages are determined was inaccurate in the first

13 instance. *See Smith v. Advanced Clinical Emp. Staffing*, LLC, No. 21-cv-07325-EJD, 2022 WL

14 2037080, at *4 (N.D. Cal. June 7, 2022) (multiplying additional per hour value of housing and

15 travel stipends by total number of overtime hours worked to calculate amount in controversy for

16 alleged overtime violations, where plaintiffs alleged defendant failed to take all forms of

17 compensation into account in determining overtime rates). Nowhere in Plaintiff's complaint does

18 Plaintiff allege that Defendant failed to pay overtime *hours*. Rather, Plaintiff repeatedly alleges

19 that Defendant failed to properly calculate the hourly overtime rate of pay by failing to include all

20 forms of compensation in the "regular rate of pay" upon which the overtime wages are based.

21     There is a fundamental mismatch between the type of overtime violation Plaintiff alleges

22 and the type of violation Defendant presumes exists in its calculation of the amount in

23 controversy. Because Defendant's calculations for Plaintiff's overtime claim are untethered to

24 what is at stake in the litigation, they cannot be used toward the amount in controversy for CAFA

25 jurisdiction purposes.

26 **C.    Meal and Rest Period Violations**

27     Under California law, an employee who experiences a meal or rest period violation is

28 entitled to "one additional hour of pay at the employee's regular rate of compensation for each

1    workday that the meal or rest . . . period is not provided." Cal. Lab. Code § 226.7(c). Plaintiff's
2    second cause of action is for meal period violations. *See* Compl. ¶¶ 25–27, 51–54. Plaintiff's
3    third cause of action is for rest period violations. *See id.* ¶¶ 28–30, 55–59. Plaintiff does not
4    specify the frequency of the alleged missed meal or rest periods. In its opposition, Defendant
5    estimates a revised amount in controversy of $1,442,899 for meal period violations and
6    $1,442,899 for rest period violations, based on a "60% violation rate" each for meal and rest
7    periods. Opp'n at 12, 14. To establish the amount in controversy for Plaintiff's meal period
8    claim, Defendant multiplies 14,588 work weeks × $32.97 average hourly wage rate × 3 missed
9    meal breaks per week for a total of $1,442,899. Opp'n at 14. For Plaintiff's rest period claim,
10   Defendant multiplies 14,588 work weeks × $32.97 average hourly wage rate × 3 missed rest
11   breaks per week for a total of $1,442,899. Opp'n at 12.

12   The Court finds Defendant has provided sufficient evidence to support the number of
13   workweeks Defendant used in calculating its revised amount in controversy for meal and rest
14   period violations. *See* Second Bergstrom Decl. ¶¶ 7–9 (establishing that 196 full-time, non-
15   exempt employees worked approximately 14,588 workweeks from January 2021 through mid-
16   January 2024, and that "[v]irtually all" of the shifts worked by these employees were over five
17   hours and thus both rest-period and meal-period eligible.). However, the Court finds that the 60%
18   violation rate Defendant applied to calculate the amount in controversy for these claims, equating
19   to three meal periods plus three rest periods per week, is not supported by a preponderance of the
20   evidence.

21   First, Defendant contends that the Complaint "contemplates at least a 50 percent violation
22   rate, if not a 100 percent violation rate" for Plaintiff's meal period claim. Notice of Removal at
23   14. Defendant likewise frames its 60% violation rate for Plaintiff's rest period claim as a
24   conservative one, repeatedly asserting that Plaintiff alleges a rest period violation for *every* rest-
25   period eligible shift. Opp'n at 10–12. Defendant grounds these assertions in Plaintiff's use of the
26   descriptor "at all relevant times." *Id.* But this language appears to describe the period throughout
27   which the alleged violations occurred rather than their frequency. Plaintiff's use of words like
28   "often" indicates that putative class members were repeatedly denied meal and rest periods, not

7

that they were denied *any* meal or rest periods whatsoever. *See* Compl. ¶¶ 25 (alleging "non-exempt employees *often* could not take timely and uninterrupted net 30-minute first meal periods before the end of the fifth hour of work . . . and *often* could not take a second 30-minute uninterrupted and timely meal period for shifts in excess of 10.0 hours") (emphasis added), 28 (alleging "non-exempt employees were and are *often* unable to take a net 10-minute duty free rest periods [*sic*] for every major fraction of four hours worked") (emphasis added). Given this context, Plaintiff's allegations that putative class members were unable to take "all" the rest breaks to which they were entitled indicate only that Defendant did not meet its affirmative obligation to provide employees 100% of the meal or rest periods it was required to provide. *See id.* ¶¶ 52, 57. Although Plaintiff attributes Defendant's alleged meal and rest period violations in part to "uniform . . . policies and practices[,]" *id.* ¶¶ 25, 28, 30, "such allegations, standing alone, do not support an assumption that the amount in controversy can be properly calculated using an assumption of a '100% violation rate.'" *De Vega*, 507 F. Supp. 3d at 1218. *See also Ibarra*, 775 F.3d at 1198–99 (holding "a 'pattern and practice' of doing something does not necessarily mean always doing something" and finding that allegations that defendant had maintained an unwritten policy mandating alleged employment violations, "including the denial of meal and rest periods . . . does not mean that such violations occurred in each and every shift.").

Second, Defendant calculates an amount in controversy based on a "60% violation rate," which Defendant takes to mean three meal period violations per week, plus three rest period violations per week. Notice of Removal at 14, 17; Opp'n at 11–12, 13–14. Defendant's proposed amount in controversy thus reflects six meal and rest period violations per employee per week. But violations of Labor Code Section 226.7 entitle an employee "to an additional hour's wages per day, even if denied both a rest and meal period during that day." *Roth v. Comerica Bank*, 799 F. Supp. 2d 1107, 1120 (C.D. Cal. 2010); *see also Lyon v. W.W. Grainger Inc.*, No. 10-cv-00884-WHA, 2010 WL 1753194, at *4 (N.D. Cal. Apr. 29, 2010) ("Labor Code Section 226.7 . . . provided for recovery per work day, *not* per violation. Defendant's estimate is therefore off by a magnitude of two[.]"). Defendant's estimated amount in controversy is thus irreconcilable with the evidence Defendant provided that putative class members worked just five shifts per week.

8

*See* Second Bergstrom Decl. ¶ 7.  Defendant also provides no support for its implicit assumption that alleged meal and rest period violations never overlapped and took place on the same day, an assumption that is unreasonable given Plaintiff's allegations that the alleged violations were attributable in part to "operational requirements" and "work demands."  Compl. ¶¶ 25, 28.

If Defendant's assumptions of three meal period violations per week, plus three rest period violations per week, are reasonable, Defendant has shown that the amount in controversy for the meal period and rest period violations counted together is at least $1,442,899, but is less than twice that.  Because the putative class members worked five shifts per week, the meal period violations totaling $1,442,899 cannot be added to the rest period violations that total $1,442,899 because some of the meal period and rest period violations occurred on the same day.  Further, there is no basis or logical reason to make the most favorable assumption to Defendant that there was minimal overlap between those violations (and therefore reduce one of these numbers by a third).  The more logical assumption is that if work demands were at the heart of both violations, they more often probably happened on the same day.  In any event, the amounts in controversy for the two types of claims cannot be added together, and the actual extent of their overlap is speculation.  Accordingly, Defendant has shown that the amount in controversy for the meal period and rest period violations counted together is at least $1,442,899, but Defendant has not shown that it is any particular amount that is greater than that.

**D.    Wage Statement Violations**

Defendant fails to establish the amount in controversy for Plaintiff's fifth cause of action, failure to provide accurate wage statements.  *See* Compl. ¶¶ 66–71.  California Labor Code Section 226 requires employers to provide each employee "an accurate itemized statement in writing" every pay period detailing, inter alia, all gross and net wages earned, hours worked, all applicable hourly rates in effect and the number of hours worked at each hourly rate.  Cal. Lab. Code § 226(a).  If an employer knowingly and intentionally violates any provision of Section 226(a), each individual employee "is entitled to recover the greater of all actual damages or fifty dollars ($50) for the initial pay period in which a violation occurs and one hundred dollars ($100) per employee for each violation in a subsequent pay period, not to exceed an aggregate penalty of

four thousand dollars ($4,000)." Cal. Lab. Code § 226(e)(1).  Based on this penalty structure, an individual employee who worked at least 41 pay periods is entitled to the maximum aggregate penalty of $4,000.  Defendant indicates that it paid employees on a bi-weekly basis.  Notice of Removal ¶ 63.  Each putative class member would thus need to have worked for Defendant for 82 weeks – approximately 1 year and seven months – to have worked the 41 requisite pay periods to be entitled to the maximum penalty.

The allegations in the Complaint support Defendant's initial assumption of a 100% violation rate for Plaintiff's wage statement claim.  Plaintiff defines the "Wage Statement Subclass" as "[a]ll current and former employees who work or worked for Defendant in California, during the one year immediately preceding the filing of the complaint through the date of trial."  Compl. ¶ 37.  Plaintiff claims that "Defendant issued wage statements which failed to accurately identify the gross wages earned, the total hours worked, the net wages earned, and the correct corresponding number of hours worked at each hourly rate[.]"  *Id.* ¶ 31.  Defendant's wage statements were allegedly inaccurate "[a]s a result of Defendant's failure to pay . . . non-exempt employees for all hours they were subject to the control of Defendant, including all[] overtime [and] sick pay wages, and Defendant's failure to pay for meal and rest period premiums at the 'regular rate of pay[.]'"  *Id.*  Based on Plaintiff's complaint, the Court finds it reasonable to assume that all wage statements for putative subclass members would contain at least some inaccuracies.

However, Defendant's assumption that each putative class member worked at least 41 pay periods and would thus be entitled to maximum penalties of $4,000 each is unsupported.  *See Moreno v. Ignite Rest. Grp.*, No. 13-cv-05091-SI, 2014 WL 1154063, at *5 (N.D. Cal. Mar. 20, 2014) (discussing separate calculations for wage statement penalties for employees who did and did not work 41 pay periods); *Moppin v. Los Robles Reg'l Med. Ctr.*, No. 15-cv-1551-JGB, 2015 WL 5618872, at *2 (C.D. Cal. Sept. 24, 2015) (same).  Defendant has not provided evidence that *any* putative Wage Statement Subclass member worked at least 41 pay periods.  Plaintiff himself only worked for Defendant for 40 weeks, from February 27, 2023 until his separation from employment on December 4, 2023, and would only be entitled to a $1,950 penalty for wage

10

1 statement violations based on his allegations. *See* Compl. ¶ 16. As noted above, Defendant has
2 provided evidence that it employed approximately 160 proposed putative class members between
3 December 19, 2022 – one year before Plaintiff brought the claim in Superior Court – and mid-
4 January 2024, and that at least 94 non-exempt employees separated from their employment with
5 Defendant between January 1, 2021 and mid-January 2024. First Bergstrom Decl. ¶ 9; Second
6 Bergstrom Decl. ¶ 10. It strains logic to assume that, with the sole exception of Plaintiff, every
7 other member of the Wage Statement Subclass remained employed with Defendant for 41 pay
8 periods. Defendant has thus failed to plausibly show an amount in controversy for wage statement
9 violations of $640,000.

10 The Court considers the amount in controversy for the wage statement violation claim to
11 be unestablished. The proposed $640,000 amount is unsupported, and the Court does not have
12 evidence or reasonable inferences before it that would allow it to determine the amount in
13 controversy is some other amount.

### E. Waiting Time Penalties

15 California Labor Code Sections 201 and 202 require employers to pay all wages owed
16 within 72 hours when employees resign, and immediately where the employee is discharged or
17 laid off. Cal. Lab. Code §§ 201–202. When an employer willfully fails to timely pay wages upon
18 separation, the employee is entitled to be paid her normal wages for every day the wages are late,
19 up to a maximum of 30 days. Cal. Lab. Code § 203. To establish the amount in controversy for
20 waiting time penalties, Defendant multiplies $32.42 average hourly wage at time of separation × 8
21 hours per day × 30 days × 93 former alleged potential class members. Opp'n at 16.

22 Plaintiff argues Defendant lacks justification for assuming a 100% penalty recovery for the
23 full 30-day period for each class member. Mot. at 14–16. However, Plaintiff explicitly alleges
24 that "Defendant [is] liable to the Waiting Time Subclass for waiting time penalties amounting to
25 thirty (30) days wages for Plaintiff and the Waiting Time Subclass . . ." Compl. ¶ 77. Plaintiff
26 further alleges that due to "Defendant's failure to pay all overtime, sick pay wages, and meal and
27 rest period premiums at the 'regular rate of pay,' Defendant also failed and continues to fail to pay
28 the non-exempt employees all wages owed at their time of separation from employment[.]" *Id.*

11

¶ 34. Plaintiff defines the "Waiting Time Penalty Subclass" to include:

> All former non-exempt hourly employees who work or worked for Defendant in California, and who left their employment during the three years immediately preceding the filing of the Complaint through the date of trial.

*Id.* ¶ 37. The Court finds the Complaint clearly alleges that Defendant owes all members of the Waiting Time Subclass waiting time penalties for the full 30-day period. This is further supported by other allegations of Plaintiff's complaint, which indicate that at least some wages were never paid to all employees. *See, e.g.*, Compl. ¶¶ 18 (alleging "Defendant's uniform failure to include all forms of compensation/remuneration . . . in calculating the 'regular rate of pay' for purposes of overtime compensation"), 22 (alleging failure "to provide . . . employees the legally required paid sick days at the legal rate pursuant to Labor Code §§ 246(a),(b) . . ."). Given Plaintiff's allegations, it is reasonable to assume that all non-exempt employees would have been owed at least some wages upon their departure. Plaintiff does not contend that Defendant paid any employee the alleged unpaid wages at any point in the 30 days after their departure.

Defendant provided evidence that at least 94 non-exempt employees separated from their employment with Defendant between January 1, 2021 and mid-January 2024, all of whom worked on a full-time basis for Defendant during that period (Second Bergstrom Decl. ¶ 10), that 93 of those employees had been separated for at least 30 days as of February 1, 2024 (*id.* ¶ 11), and that the average rate of pay at the time of separation was $32.42. (First Bergstrom Decl. ¶ 8). Although the rate of pay at the time of departure likely varied somewhat for each employee within the subclass, the Court finds the figures Bergstrom provided in her declarations reasonable for calculating these penalties. Using these figures yields an amount in controversy of $723,614 in alleged waiting time penalties.

Accordingly, the Court considers Defendant's estimate of $723,614 in alleged waiting time penalties as part of the amount in controversy for CAFA jurisdiction purposes.

**F.  Failure to Pay Sick Time and Failure to Reimburse Necessary Business Expenses (Fourth and Seventh Causes of Action)**

Plaintiff alleges Defendant failed to provide putative class members paid sick days at the required rate and that Defendant failed to reimburse putative class members for necessary business

12

1    expenditures, such as expenses for use of personal cell phones used for work calls. Compl. ¶¶ 22–
2    24, 35–36, 60–65, 78–81.  Defendant did not provide an estimate of the amount in controversy for
3    these claims in its notice of removal or opposition but concludes these claims "further increase the
4    amount in controversy beyond the jurisdictional minimum of $5,000,000." Notice of Removal ¶
5    69–70.  Accordingly, the Court does not estimate of the amount in controversy for these claims.

**G.     Attorneys' Fees**

In determining whether CAFA's amount-in-controversy requirement is satisfied, the district court "must include future attorneys' fees recoverable by statute or contract." *Fritsch v. Swift Transportation Co. of Arizona, LLC*, 899 F.3d 785, 794 (9th Cir. 2018).  "The defendant retains the burden, however, of proving the amount of future attorneys' fees by a preponderance of the evidence." *Id.* at 788.

In its notice of removal, Defendant claims an additional amount in controversy of at least $1,254,471, based on 25% of the $5,017,884 Defendant calculated in alleged overtime violations, waiting time penalties, wage statement penalties, and meal and rest period violations.  Notice of Removal ¶ 72.  Plaintiff does not dispute the 25% attorneys' fee benchmark but contends that only his Labor Code Section 226 and overtime claims expressly authorize an award of attorneys' fees. Mot. at 17.  However, Plaintiff has requested attorneys' fees "on all causes of action" pursuant to California Code of Civil Procedure § 1021.5, which authorizes attorneys' fees "in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on . . . a large class of persons, (b) the necessity and financial burden of private enforcement . . . are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any." Compl., Prayer for Relief ¶ 14 ("On all causes of action, for attorneys' fees and costs as provided by Labor Code §§ 218.5, 226, 1194, Code of Civil Procedure § 1021.5"); Cal. Civ. Proc. Code § 1021.5. Thus the fee calculation may be based on the total pre-fee amount in controversy.

As discussed above, the Court finds Defendant has demonstrated the amount in controversy by a preponderance of the evidence for some, but not all, of Plaintiff's claims. The

1  Court finds Defendant has failed to show the amount in controversy for the overtime claims; has
2  shown that the amount in controversy for the meal period and rest period violations counted
3  together is at least $1,442,899, but has not shown it is any greater than that; has failed to show the
4  amount in controversy for the wage statement claims; has shown an amount in controversy of
5  $723,614 in alleged waiting time penalties. Based on these figures and a 25% fee calculation, the
6  attorneys' fees in controversy total $541,628.

## V. CONCLUSION

"[T]he defendant seeking removal bears the burden to show by a preponderance of the evidence that the aggregate amount in controversy exceeds $5 million[.]" *Ibarra*, 775 F.3d at 1197. Here, Defendant failed. It showed by a preponderance of the evidence that the total amount in controversy, including attorneys' fees, is $2,708,141. As this is below the $5 million threshold required for original federal jurisdiction under CAFA, the Court finds that it does not have jurisdiction to hear this case. Accordingly, Plaintiff's motion to remand to the Superior Court of Contra Costa County is **GRANTED**. The Clerk of Court shall remand this case promptly to the Superior Court.

**IT IS SO ORDERED.**

Dated: August 16, 2024

THOMAS S. HIXSON
United States Magistrate Judge